UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| CASANDRA WATKINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:24-CV-163-ACL |
| | ) | |
| LOUIS DEJOY, Postmaster General<br>United States Postal Service, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM AND ORDER**

Plaintiff Casandra Watkins brings this action against Defendant Louis Dejoy, Postmaster General of the United States, alleging race, color, and sex discrimination, along with retaliation, related to the reduction in her work hours at the United States Postal Service ("USPS") after sustaining a work-related injury.

Presently before the Court is Defendant's Motion for Summary Judgment. (Doc. 37.) The matter is fully briefed and ready for disposition.

## I. Background Facts[1]

Watkins began working for the USPS in March 2014, as a non-career City Carrier Assistant at the Poplar Bluff Post Office ("PO") in Popular Bluff, Missouri. She served several one-year appointments until she was contractually converted to a career Part Time Flexible City Carrier at the Poplar Bluff PO on September 15, 2018. She became a full-time regular City Carrier on May 25, 2019.

[1] The Court's recitation of the facts is taken from the parties' statements of uncontroverted facts, their responses thereto, and the exhibits filed by the parties.

Christina Strauch was a Postmaster at the Poplar Bluff PO from August 14, 2021, until her retirement on September 30, 2024. Strauch was employed with the USPS for 31 years, and had worked in various positions at different facilities prior to her service at the Poplar Bluff PO.

The term "limited duty" refers to work options offered by the USPS to employees with restrictions due to an injury or illness that the Department of Labor's Office of Workers' Compensation Programs ("OWCP") accepted as *work related*. The USPS's rules and regulations that govern *limited duty* assignments include, but are not limited to: the Employee and Labor Relations Manual ("ELM") § 546.141; and Handbook EL-505 Injury Compensation. *See* Doc. 37-26 at 2.

The term "light duty" refers to work provided by the USPS to employees with restrictions due to a non-compensable injury or illness, commonly referred to as an *off-the-job injury*. *Id.*

***Watkins' Injury***

Watkins reported that she sustained a work-related injury to her left shoulder on March 28, 2023, while picking up a tray of flats to load on her car. She complained that she was having shoulder pain, reduced mobility, and weakness. Watkins' doctor, Andrew C. Trueblood, M.D., diagnosed her with a left shoulder rotator cuff tear on May 18, 2023. He provided Watkins with a letter and opined that she could return to work and perform her job duties with the restriction of no overhead lifting. On May 20, 2023, Strauch offered Watkins a limited duty assignment restricting Watkins from engaging in overhead lifting, which Watkins accepted on the same date. Watkins filed a worker's compensation claim, which was accepted by the Department of Labor on June 9, 2023. On June 27, 2023, Dr. Trueblood provided Watkins with a letter and opined that she could return to work on a light duty basis immediately with the restriction of no

overhead lifting.

Watkins had surgery on her left shoulder in August 2023.

***Limited Duty Assignments at Issue***

On **September 13, 2023**, Dr. Trueblood provided Watkins with a letter indicating the following restrictions on her left upper extremity: no lifting, no pushing and no pulling, must wear sling at all times, keyboard work only. Watkins provided Dr. Trueblood's letter to Strauch for a limited duty assignment on the same date. Strauch did not fill Watkins' request for a limited duty assignment, asserting that she did not have keyboard only work available.

On October 2, 2023, Dr. Trueblood provided Watkins with a letter with restrictions on the "left upper extremity" of no lifting, no pushing and no pulling, and must wear sling at all times.

On **October 5, 2023**, Strauch presented Watkins with a PS Form 2499, Offer of Modified Assignment-Limited Duty ("Form 2499"), listing the duties of Watkins' modified duty as "Case letters and flats ONLY" on C007 (Watkins' Bid Route) and C004 (Watkins' Auxiliary Route), with the average time spent on these activities as 2 hours. (Doc. 37-17 at 1.) The physical requirements of this modified assignment restricted Watkins from lifting, pushing, and pulling with her left arm, and required her to wear a sling at all times.

On October 11, 2023, Dr. Trueblood provided Watkins with a letter opining that she may return to light duty immediately with the restrictions of no pushing, no pulling, no overhead lifting, and lifting restrictions of ten pounds only.

On **October 13, 2023**, Strauch presented Watkins with a Form 2499 Offer of Modified Assignment (Limited Duty). That form stated that the duties of Watkins' modified assignment

would include casing letters and flats on her C07 and C04, casing small parcels and rolls within her restrictions on C07 and C04, and pulling down cases within her restrictions on C07 and C04. The average time for these modified assignments was up to 3 hours. The physical requirements of this modified assignment restricted Watkins to no pushing, no pulling, and lifting with restrictions of 10 pounds only for up to 3 hours. Watkins signed Form 2499 on October 13, 2023.

On November 22, 2023, Dr. Trueblood provided Watkins with a letter stating that she should follow restrictions to her left upper extremity of "can drive, no overhead lifting, no lifting greater than 20 lbs to waist, height, ok for 8 hr work days." (Doc. 37-20.) Watkins presented Dr. Trueblood's letter to Strauch.

On **November 27, 2023**, Strauch presented Watkins with a Form 2499 Offer of Modified Assignment (Limited Duty) clearing Watkins to work up to eight hours a day with the restrictions of no overhead lifting with her left arm. The physical requirements of this modified assignment restricted Watkins to no overhead lifting with the left arm and no lifting greater than twenty pounds to waist height with the left arm. Watkins signed the Form 2499 on the same date.

On February 15, 2024, Dr. Trueblood provided Watkins with a letter stating that she could return to work with no restrictions.

Watkins took leave without pay from September 2023 through January 2024, and received $7,180.85 from the OWCP based upon the days that she claims she should have been able to work a full eight-hour period of time. Watkins testified that the payment she received from OWCP amounted to approximately sixty percent of her standard hourly rate. (Doc. 37-25

at 153.) The USPS was required to reimburse OWCP for the hours of workers' compensation pay that Watkins received.

***EEO Activity***

On **November 27, 2023**, Watkins had her initial contact with the EEO Office and filed an informal complaint on November 27, 2023. There, she referenced October 13, 2023 as the date of incident for her claims of race, color, and sex discrimination along with retaliation regarding her prior EEO activity. Watkins had previously filed discrimination complaints with the EEO Office on November 10, 2016, and September 22, 2017.

On December 11, 2023, Watkins initiated an informal Step A action on the issue of alleged failure to provide adequate limited duty assignments between October 5, 2023, and November 22, 2023. The grievance was resolved at Step B by providing Watkins a one-time lump sum payment of $802.03. On February 28, 2024, Watkins filed a formal EEO complaint, claiming that the USPS discriminated against her based on race (African American), color (Black), sex (female), and sexual orientation (lesbian), when on dates specified after October 13, 2023, she allegedly was forced to work a reduced schedule. She also cited her prior EEO activity in 2016, 2017, and her November 2023 EEO contact as a basis of alleged retaliatory conduct, including alleged retaliatory surveillance on November 27, 2023 and January 2, 2024. Watkins identified five comparators from the Poplar Bluff PO in her EEO Investigation Affidavit as similarly situated individuals who were not forced to work reduced hours after their injuries: S.E., T.D./T.H., J.P., B.S., and B.B. Strauch identified J.S. as a comparator.

On July 31, 2024, an EEO Services Analyst rendered a Final Agency Decision-Mixed, concluding that the evidence did not support a finding of discrimination and retaliation for

Watkins' EEO 2016 and 2017 complaints. The decision allowed Watkins the right to file an appeal of the decision with the Merit Systems Protection Board or file a civil action in a district court within 30 days of receiving the decision.

***The Complaint***

Watkins filed the instant action on August 29, 2024, alleging race discrimination (Count I), sex discrimination (Count II), and retaliation (Count III). (Doc. 1.) Watkins contends that Strauch refused to provide full-time limited duty work after her work-related injury, while Strauch provided such work to similarly situated Caucasian, heterosexual injured employees. She further argues that Defendant retaliated against her because of her opposition to unlawful employment practices by denying her "make work" opportunities while she was on limited duty assignments and by subjecting her to improper monitoring and/or discipline.

Defendant now moves for summary judgment on the following bases: (1) Watkins failed to exhaust her administrative remedies with regard to one of her claims, which is also untimely; (2) Watkins cannot establish circumstances that give rise to an inference of discrimination; (3) Defendant has legitimate non-discriminatory reasons for its actions; (4) Watkins cannot demonstrate pretext; and (5) Watkins' retaliation claim fails.

Watkins responds that her claims were properly exhausted and are timely. She next argues that summary judgment should be denied on her race and sex discrimination claims, because a reasonable fact finder could conclude that Strauch's denial of Watkins' request for full-time limited duty was the result of Strauch's discriminatory animus, and that her proffered justifications are pretextual. Watkins argues that summary judgment should be denied on her retaliation claim, because a reasonable fact finder could conclude that Strauch minimized

Watkins' limited-duty assignments in retaliation for Watkins' complaints about discrimination.

## II. Summary Judgment Standard

Summary judgment is appropriate if, viewing all facts in the light most favorable to the nonmoving party, there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Material facts are those facts "that might affect the outcome of the suit under the governing law," and a genuine dispute over material facts is one "such that a reasonable jury could return a verdict for the nonmoving part[ies]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment bears the burden of showing a lack of a genuine dispute as to any material fact, *Celotex Corp.*, 477 U.S. at 323, and the Court views the facts in the light most favorable to the nonmoving party, drawing all reasonable inferences in that party's favor, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588–89 (1986). To survive a motion for summary judgment, the nonmoving party must substantiate her allegations with "sufficient probative evidence that would permit a finding in her favor based on more than mere speculation, conjecture, or fantasy." *Mann v. Yarnell*, 497 F.3d 822, 825 (8th Cir. 2007) (quotation omitted).

## III. Discussion

As an initial matter, Watkins argues in her Response that Defendant's Motion should be denied because it fails to comply with the requirements of Federal Rule of Civil Procedure 56(c)(1) or E.D. Mo. Local Rule 4.01(E). More specifically, Watkins argues that none of Defendant's 32 separately numbered paragraphs include any reference to the record or any supporting citation. Watkins also filed a Motion to Strike Defendant's Statement of Material Facts. (Doc. 44.)

Defendant responded that it inadvertently omitted citations to the record from its Statement of Material Facts, and requested leave to file an Amended Statement of Uncontroverted Material Facts pursuant to Rule 15(a)(1)(B). (Doc. 52.)

In an Order dated May 12, 2026, the Court granted Defendant leave to file its Amended Statement of Material Fact (Doc. 52-1), and denied Watkins Motion to Strike. (Doc. 60.) Because Defendant has cured the noted deficiencies in its Statement of Material Facts, Watkins' argument is moot.

**A. Exhaustion and Timeliness of September 13, 2023 Claim**

In her Complaint, Watkins argues that she was "barred from returning to duty" following her doctor's release on September 13, 2023, because she was limited to "keyboard work only." (Doc. 1 at 5.) Defendant argues that this claim should be dismissed as it is unexhausted and untimely.

Title VII "establishes an administrative procedure which a complaining employee must follow before filing a lawsuit in federal courts." *Williams v. Little Rock Mun. Water Works*, 21 F.3d 218, 222 (8th Cir. 1994). For federal employees, this requires that a complainant initiate contact with an Equal Employment Opportunity counselor "within 45 days of the date of the matter alleged to be discriminatory." 29 C.F.R. § 1614.105(a)(1). "If the matter cannot be resolved informally with the help of the counselor," then the federal employee may "file a formal EEO complaint with the agency." *Burkett v. Glickman*, 327 F.3d 658, 660 (8th Cir. 2003) (citing 29 C.F.R. § 1614.105(a)(1)). A plaintiff must meet this requirement for each employment practice alleged to be discriminatory or retaliatory. *See Voss v. Hous. Auth. Of the City of Magnolia,* 917 F.3d 618, 623 (8th Cir. 2019).

A plaintiff "may seek relief for any discrimination that grows out of or is like or reasonably related to the substance of the allegations in the administrative charge." *Nichols v. American Nat. Ins. Co.,* 154 F.3d 875, 886-87 (8th Cir. 1998). To determine whether an allegedly discriminatory action falls within the scope of a claim, the administrative complaint must be construed liberally in order to further the remedial purposes of applicable legislation. *Cobb v. Stringer,* 850 F.2d 356, 359 (8th Cir. 1988). "The breadth of the civil suit is ... as broad as the scope of any investigation that reasonably could have been expected to result from the initial charge of discrimination." *Stuart v. General Motors* 217 F.3d 621, 630-31 (8th Cir. 2000).

Here, Defendant notes that Watkins did not contact an EEO Counselor until November 27, 2023, and alleges that the first date of discrimination occurred on October 13, 2023. Defendant argues that Watkins' claim regarding the September 13, 2023 incident is untimely, as she contacted the EEO Counselor *thirty days after* the 45-day deadline.

Watkins responds that Strauch's conduct in September 2023 is "reasonably related" to Strauch's October 13, 2023 conduct, and falls within the expected scope of the EEO investigation. Watkins notes that the September incident *did arise* in the EEO investigative file. As such, Watkins argues that the September 2023 claim is administratively exhausted and timely. The undersigned agrees.

In Watkins' original November 27, 2023 EEO Complaint, she asserted that the alleged discrimination took place "at least October 13, 2023." (Doc. 37-3 at 69.) In the narrative section of her Complaint, Watkins states that she suffered an on-the-job shoulder injury in March 2023, and has been discriminated against by her employer based on her race, color, sex, and sexual orientation, and has been retaliated against. *Id.* She states that she underwent shoulder surgery

on August 31 2023, and on September 13, 2023, she was released by her medical providers for light duty that required her to wear a sling on the injured arm and barred her from pushing or pulling any significant weight and limited her to "keyboard work only." *Id.* Watkins alleges that Strauch insisted she had no work for Watkins and refused to return her to work in any modified capacity even though there were duties she could have allowed her to perform. *Id.* Watkins then sets out the October 11, 2023 restrictions imposed by her doctor and Strauch's refusal to permit Watkins to perform administrative work, arguing that Strauch had permitted similarly situated heterosexual, Caucasian employees to perform such administrative work. *Id.*

The undersigned finds that, construing Watkins' allegations liberally, Strauch's actions on September 13, 2023, were reasonably related to her actions on October 13, 2023. Although Watkins provided a discrimination date of "at least October 13, 2023," she described in detail the September 13, 2023 conduct and it is clear that it is reasonably related to the October 13, 2023 allegation of discrimination. Watkins framed her EEO claim as discrimination related to her release to work following a March 2023 on-the-job injury. Because Watkins was released to work on September 13, 2023, and sets out Strauch's alleged discriminatory actions on this date in her Complaint, this incident is reasonably related to the October 13, 2023 incident. As Watkins points out, the September 13, 2023 conduct *was referenced* in the EEO investigative file. (Doc. 37-7 at 69; 122.)

Thus, Watkins' claim that she was barred from returning to duty following her doctor's release on September 13, 2023, is administratively exhausted and timely.

**B. Watkins' Race and Sex Discrimination Claims (Counts I and II)**

In the first two counts of her Complaint, Watkins alleges race (Count I) and sex (Count II) discrimination in violation of Title VII, 42 U.S.C. § 2000e, *et seq*.

"To survive a motion for summary judgment on a discrimination claim, a plaintiff must present admissible evidence directly indicating unlawful discrimination, or create an inference of unlawful discrimination under the burden-shifting framework established in *McDonnell Douglas*." *Rooney v. Rock-Tenn Converting Co.,* 878 F.3d 1111, 1115-16 (8th Cir. 2018) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Watkins acknowledges no one said anything derogatory about her race, sex, sexual orientation, or prior EEO activity when she was released to return to work following her shoulder surgery. In other words, she has no direct evidence of unlawful discrimination. Watkins must therefore establish an inference of unlawful discrimination.

To establish an inference of unlawful discrimination, there are three steps: (1) the plaintiff must establish the *prima facie* case for discrimination; (2) the burden of production then shifts to the employer to show a legitimate, non-discriminatory reason for its decision; and, if the employer produces such evidence; (3) the burden of production shifts back to the plaintiff to show the proffered reason was mere pretext for intentional discrimination. *See McDonnell Douglas*, 411 U.S. at 802-05; *see also Edwards v. Hiland Roberts Dairy, Co.*, 860 F.3d 1121, 1125–26 (8th Cir. 2017). "While the proof necessary to establish a prima face case is minimal, [Plaintiff] must present more substantial evidence to establish pretext because evidence of pretext ... is viewed in light of the employer's justification." *Mahler v. First Dakota Title Ltd. P'ship*, 931 F.3d 799, 805 (8th Cir. 2019) (citation and internal quotation marks omitted).

"Despite this shifting of the burden of production, the plaintiff at all times bears the ultimate burden of persuasion." *Heisler v. Nationwide Mutual Ins. Co.*, 931 F.3d 786, 794 (8th Cir. 2019).

***Watkins' Prima Facie Case***

A *prima facie* case of discrimination requires Plaintiff to show: (1) she is a member of a protected class; (2) she was meeting the legitimate expectations of the employer; (3) she suffered an adverse employment action; and (4) suffered under circumstances permitting an inference of discrimination. *Schaffhauser v. United Parcel Serv., Inc.*, 794 F.3d 899, 903 (8th Cir. 2015) (citing *Davis v. Jefferson Hosp. Ass'n*, 685 F.3d 675, 681 (8th Cir. 2012)).

Here, Defendant does not dispute for the purposes of its Motion that Watkins is a member of a protected group, that she was meeting the legitimate expectations of Defendant, or that she suffered an adverse employment action in not being allowed to work a full day on limited duty assignments. Defendant argues that Strauch's conduct is insufficient to provide an inference of discrimination.

Watkins contends that a reasonable fact finder could conclude from the evidence in the record that Strauch's denial of Watkins' request for full-time limited duty was the result of Strauch's discriminatory animus, and that her proffered justifications are pretextual.

Evidence of pretext, normally considered at step three of the *McDonnell Douglas* analysis, can satisfy the inference-of-discrimination element of the prima facie case. *See Putman v. Unity Health Sys.,* 348 F.3d 732, 736 (8th Cir. 2003). At the inference-of-discrimination stage, "[a] plaintiff may show pretext, among other ways, by showing that an employer (1) failed to follow its own policies, (2) treated similarly-situated employees in a disparate manner, or (3)

shifted its explanation of the employment decision." *Young v. Builders Steel Co.*, 754 F.3d 573, 578 (8th Cir. 2014).

Defendant has made a compelling argument that Watkins fails to satisfy the inference of discrimination element of her prima facie case of discrimination. Watkins relies on the same evidence to show an inference of discrimination as she does to establish pretext. Even if Watkins had established a prima facie case, she has not carried her burden under *McDonnell Douglas* of producing evidence of pretext. Thus, the Court will assume that Watkins has met the low standard for proving a prima facie case.

***Defendant's Legitimate, Non-Discriminatory Reason***

Defendant has explained that Strauch relied on complex USPS regulations, medical restrictions, and then existing staffing considerations each time she determined Watkins' limited duty assignment. These explanations satisfy Defendant's burden to show its legitimate, nondiscriminatory reasons for Watkins' reduction in hours, and shift the burden back to Watkins to produce evidence that these proffered nondiscriminatory reasons are a pretext for discrimination.

***Pretext***

"[M]ore substantial evidence of discrimination is required to prove pretext, because evidence of pretext is viewed in the light of [the defendant]'s legitimate, non-discriminatory explanation." *Quinonez-Castellanos v. Performance Contractors, Inc.*, 2017 WL 6519033, at *8 (N.D. Iowa 2017) (quoting *Jones v. United Parcel Serv.*, 461 F.3d 982, 992 (8th Cir. 2006)). "Because the burden to prove pretext merges with the ultimate burden of persuading the court that the plaintiff was the victim of intentional discrimination, the plaintiff must do more than

simply create a factual dispute as to the issue of pretext; he must offer sufficient evidence for a reasonable trier of fact to infer discrimination." *Canning v. Creighton Univ.*, 995 F.3d 603, 612 (8th Cir. 2021) (cleaned up).

An employee "may demonstrate pretext in multiple ways, including (1) by demonstrating that the employer's proffered reason has no basis in fact; (2) that similarly situated employees were treated more leniently; (3) that the employer changed its explanation for why it fired the employee; and (4) that the employer deviated from its policies." *Phillips v. Mathews*, 547 F.3d 905, 913 (8th Cir. 2008).

Watkins argues that the following pretextual conduct of Strauch gives rise to an inference of discrimination: (1) Strauch failed to adhere to policies on limited duty assignments; (2) Strauch treated similarly situated employees more favorably than Wakins in her limited duty assignments; and (3) Strauch's explanations of her employment decisions shifted.

**1. Adherence to Policies**

The Code of Federal Regulations references various USPS handbooks, manuals, forms, and publications that govern procedures at the USPS. *See* 39 C.F.R. § 211.2. Strauch identified Handbook EL-505 as a source upon which she relied in making decisions in this matter. (Doc. 41 at 7.) For example, Defendant notes that EL-5-505 provides Limited Duty Assignment Guidelines, which direct that management must first look inside the particular post office and within the employee's job classification to assign limited duty assignments within the employee's medical restrictions. (Doc. 37-2 at 160.) EL-505 provides that management cannot make the limited duty job more desirable than the employee's regular job, or it "may seem like a reward." *Id.* Conversely, if the limited duty job is less attractive, it "may seem like a

punishment." *Id.* Additionally, the modified job assignment should involve little or no additional training since the employee will be in that work assignment for a short period of time. *Id.* Finally, the assignment should result in a tangible product and should not be a "make work" job. *Id.* Defendant argues that these regulations, combined with Watkins' medical documentation, formed the basis of Strauch's offers of modified assignments to Watkins.

Additionally, Watkins notes that ELM 546.141 required Strauch to "make every effort to assign [Wakins] to limited duty consistent with [Watkins'] work limitation tolerance." (Doc. 37-2 at 155.) She states that the USPS's stated objective in assigning employees limited duty is to "minimize any adverse or disruptive impact on the employee." *Id.* Watkins notes that Defendant provides another, more "self-serving basis" for the push to provide workers sufficient limited duty assignments—when an injured worker applies for workers' compensation, Defendant must reimburse OWCP for any workers' compensation the employee receives. Watkins argues that, despite these USPS policies and financial motivations, Strauch consistently failed to make efforts to assign Watkins full-time limited duty work, as set out below.

First, Watkins contends that when she provided Strauch with her medical restrictions on September 13, 2023, Strauch applied a narrow reading of Dr. Trueblood's "keyboard only work" restriction to deny Watkins any limited duty assignments. Watkins states that Strauch admits that when formulating the denial of limited duty assignments, she spent only "a few minutes trying to figure out if she could" offer any keyboard only tasks, and did not consider whether Watkins could perform other administrative tasks like answering phones. (Doc. 37-24 at 155, 161.) She further notes that EL-505 instructs supervisors to contact OWCP's occupational health nurse or the employee's assigned medical provider where the supervisor believes a prescribed

restriction "lacks supporting rationale." (Doc. 37-2 at 157.) Watkins points out that Dr. Trueblood commented in his letter that Defendant should call if there were "any questions or concerns." (Doc. 37-15.) Strauch testified that on at least one occasion she has contacted OWCP to clarify an ambiguous work restriction. (Doc. 37-24 at 120.)

Defendant responds that Strauch did not question Dr. Trueblood's work limitations, as she found them to be clear and specific. Defendant further argues that assigning Watkins a job answering phones would have constituted "make work." Defendant points to the following deposition testimony of Strauch in support:

> Q. Okay. So just that last part, the keyboard only work, is what I want to hone in on or just a moment here. Um, when you saw keyboard work only, what did you understand that restriction to contemplate?
>
> A. She could only work on a computer. That is it, nothing else.
>
> Q. And you took it the most literally narrowly defined possible, correct?
>
> A. ***I took it what the doctor said she could do. Keyboard work only.***
>
> Q. Okay. So when you saw that it didn't you, didn't think, for instance, "Oh, well, if she can work on a computer, she could probably pick up a telephone"?
>
> A. No. ***That is make-work.***
>
> Q. Okay. Well, we'll get to that.
>
> A. ***But it's also not part of what that says. Keyboard work only.***
>
> Q. Right. And you took it the most literally narrowly defined possible, correct?
>
> A. ***I took it what the doctor said she could do. Keyboard work only.***

*Id.* at 155 (emphasis added).

Strauch's testimony shows that she did not believe Dr. Trueblood's restrictions were ambiguous. Because Strauch did not have any questions about the meaning of "keyboard work

only," she did not violate USPS policy by failing to contact OWCP's occupational health nurse or Dr. Trueblood.

Watkins characterizes Strauch's interpretation of "keyboard work only" as "narrow," and her failure to seek clarification as "dismissive" and violative of the "spirit" of Defendant's policy to make every effort to assign limited duty work. (Doc. 48 at 7-8.) Even assuming Watkins' argument is true and Strauch's interpretation was erroneous, this does not show discriminatory animus.

While "an employer's deviation from its own policies can, in some instances, provide evidence of pretext," *Russell v. TG Missouri Corp.*, 340 F.3d 735, 746 (8th Cir. 2003), the mere fact that corporate policies are not followed does not show that the employer's stated reason is subterfuge for discrimination. *See Schaffhauser*, 794 at 904 ("Although an employer's violation of its own policies may be indicative of pretext, that is not always so.") (quoting *Anderson v. Durham D & M, LLC*, 606 F.3d 513, 522 (8th Cir. 2010)). "An employer can certainly choose how to run its business, including not to follow its own personnel policies regarding termination of an employee or handling claims of discrimination, as long as it does not unlawfully discriminate in doing so." *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 863 (8th Cir. 2009) (internal quotation marks omitted).

"[F]ederal courts do not sit as a super-personnel department that reexamines an entity's business decisions," even if those decisions might seem unwise, unfair, or even incorrect. *Main v. Ozark Health, Inc.*, 959 F.3d 319, 325 (8th Cir. 2020) (quoting *Wilking v. Cnty. of Ramsey*, 153 F.3d 869, 873 (8th Cir. 1998)). "Even if the employer's acts are unfair, there has to be

evidence connecting the unfairness to a discriminatory animus." *Schaffhauser*, 794 F.3d at 904. Watkins identifies no such evidence.

Watkins next challenges Strauch's interpretation of USPS regulations following Dr. Trueblood's October 2, 2023 restrictions. At this time, Dr. Trueblood limited Watkins to "restrictions to her left upper extremity of no lifting, no pushing, no pulling, must wear sling at all times." (Doc. 37-16.) Strauch issued a limited duty assignment to Watkins on October 5, 2023, which allowed her to case (sort) letters and flats on her bid and auxiliary routes, with the average time spent on these activities as two hours. (Doc. 37-17.)

Watkins wanted more than two hours of work, and argues that Strauch did not fulfill her duty under USPS regulations to search for "adequate work" that is "available" within Watkins' craft in the work facility to which she was assigned. (Doc. 37-7 at 300.) She contends that Strauch made no effort to determine whether any other carriers would allow Watkins to assist them in casing their routes or otherwise assist them. She further argues that Strauch did not seriously consider alternative assignments outside of Watkins' craft.

Defendant responds that Strauch fulfilled her obligation under regulations by searching for "available" work to draft a limited duty assignment. (Doc. 37-7 at 300.) Defendant contends that regulations do not provide that work being performed by other employees is "available" work, and work is not "available" if assigning it would violate a law, regulation, or provision within the collective bargaining agreement. Strauch explained to Watkins in a recorded conversation that she did not know whether particular routes in the future had "available work" for Watkins to perform, as the amount of time to case and deliver a route is determined each morning. (Doc. 37-7 at 170.) Postal regulations also provided guidance as to staffing given the

fluid nature of mail as described by Strauch. Under these regulations, carriers are directed to assess the amount of mail received in the morning and the time it will take case to case, and inform their supervisor if they need assistance that day. (Docs. 57-1 at 2; 57-6 at 8.)

As to Watkins' request to assist other carriers in casing their routes, Defendant responds that labor agreements and ELM 434.6 would have required Strauch to pay the assigned carrier an out-of-schedule premium to change the schedule and have the carrier come in to deliver the route after Watkins cased it. (Doc. 57-1 at 2.) Additionally, Strauch did not know until the "day of" whether a particular route would have overtime, and when overtime work existed she had to follow the requirements of Handbook EL-901. *Id.* at 3-4. This required that Strauch utilize carriers who signed up before each quarter to be on an "Overtime Desired" list and then city carriers on the "Work Assignment" list before assigning overtime to other employees. *Id.* As Strauch testified, "[i]f there is a route that is creating overtime, I could not pull the office duties and give them to Cassandra. The reason is, I would have to start that carrier at a different time, the other carrier, and that would be a violation of the national arbitration—or the national agreement. So I could not do that." (Doc. 37-24 at 172.) She explained that she did not consult with carriers or other employees about their workload because she was familiar with the needs of the facility. *Id.* at 131.

As previously noted, Watkins argues that Strauch did not seriously consider alternative assignments outside of Wakins' standard job duties, such as administrative tasks. Instead, Watkins notes that Strauch testified that she did not need administrative assistance because she "already had two supervisors, a 204b[2], and myself." (Doc. 37-24 at 185.) Watkins argues that

---

[2] Strauch explained that a "204b" refers to "when someone steps up into an acting supervisor

Strauch admits that she did not consider whether the addition of a supervisor would interfere with her ability to provide sufficient limited duty work assignments to injured workers. Strauch testified that she "never created a 204 position *for* any particular class person, anything." *Id.* (Emphasis added.) Rather, "it was based on the workload of management." *Id.*

The fact that Strauch fully staffed her office without consideration to providing administrative work for injured employees does not raise an inference of discrimination. In a similar argument, Watkins argues that Strauch did not develop a "limited duty program" that includes a "special bank of limited duty tasks to be filled only by injured employees," as required by EL-505. (Doc. 48 at 8-9.) Strauch testified that she did not need to set up this type of program because the Poplar Bluff location was not one of the "larger offices," and explained, "I did not have very many people that would have accidents, so I did mine on a case-by-case basis based on their restrictions, what craft they were in, what work they can do within their craft, if there was anything available in another craft, et cetera. So I did not limit myself to some list that was created at some time of possibilities." (Doc. 37-24 at 148-49.) Even if Strauch violated regulations in failing to set up such a limited duty program, this does not provide an inference of discrimination.

Watkins next challenges Strauch's response to Dr. Trueblood's October 11, 2023 note. At that time, Dr. Trueblood restricted Watkins to "no Pushing, No Pulling, No overhead Lifting, lifting restrictions of 10 lbs only." (Doc. 37-7 at 236.) Watkins argues that Strauch again narrowly interpreted this order and violated EL-505 by not assigning Watkins work on a Long Live Vehicle ("LLV") without contacting Dr. Trueblood for clarification. (Doc. 48 at 10.) She

---

position." (Doc. 37-24 at 72.)

contends that Strauch instead capped Watkins' hours and placed explicit limitations that only allowed her to case her route and one auxiliary route.

Watkins' counsel asked Strauch during her deposition if she thought it was important to clarify with Dr. Trueblood whether his stated limitations "contemplated no pushing more than 10 pounds, no pulling more than 10 pounds, or no overhead lifting more than 10 pounds." (Doc. 37-24 at 214.) Strauch responded that she took the orders "as the way he wrote it." *Id.* With regard to Watkins' ability to operate an LLV with the restrictions, Strauch found that she could not, as it would require her to "push and pull the driver's door open/closed and push and pull the rear door of the vehicle." *Id.* at 218.

Strauch's refusal to assign Watkins work on an LLV following Dr. Trueblood's October 11, 2023 order does not provide evidence of pretext. Strauch interpreted Dr. Trueblood's orders as they were written: to allow no pushing, pulling, or overhead lifting. Strauch did not clearly violate EL-505 in concluding, without contacting Dr. Trueblood, that Watkins could not work on an LLV. Even if Strauch's interpretation was narrow or incorrect, it does not support an inference of discrimination.

Finally, Watkins argues that Strauch should have sought assistance with finding work assignments for her, and should have sought work from outside the Poplar Bluff office. Strauch testified that she did not reach out to any other individuals or facilities because she had been instructed by OWCP that, once she finds work within her office, she is not required to find work outside of her office. (Doc. 37-24 at 183-84.) Defendant notes that this is consistent with guidance regarding establishing an informal limited duty program. Specifically, EL-505 "[r]equires IC personnel to assist the supervisor in finding a suitable assignment, if the

supervisor's initial response is that he or she does not have *any* work that the injured employee can do…" (Doc. 37-2 at 155, emphasis added.) Because Strauch provided Watkins with limited duty work assignments that were available and consistent with Dr. Trueblood's orders, she did not violate this policy.

In sum, Watkins has not demonstrated that Strauch violated USPS policies in construing Dr. Trueblood's orders and assigning her limited duty work. To the extent Strauch did fail to follow policy, Watkins has presented no evidence to create a dispute of material fact that the failure to follow any policy was pretextual discrimination.

**2. Comparator Evidence**

Watkins next argues that Strauch treated similarly situated Caucasian, heterosexual injured employees more favorably than Wakins in assigning limited duty work. Defendant responds that none of Watkins' cited comparators are similarly situated.

To show that an employer treated similarly-situated employees in a disparate manner, a plaintiff must show that the purported "similarly-situated employees" are similarly-situated "in all relevant respects," that is, they "must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Collins v. Kansas City Missouri Pub. Sch. Dist.*, 92 F.4th 770, 772 (8th Cir. 2024) (citations omitted). This is a "rigorous" standard, *id.*, and Watkins fails to meet it here.

Watkins identifies the following heterosexual, Caucasian employees, all of whom were supervised by Strauch and subject to the provisions of ELM and EL-505: B.B., T.H., S.E., J.P., and B.S. (Doc. 37-7 at 111.) The positions of the comparators named by Watkins follows:

**B.B.**= Vehicle Operations Maintenance Assistant

**T.H.**= Rural Carrier

**S.E.**= Rural Carrier

**J.P.**= Rural Carrier

**B.S.**= Supervisor Customer Services

*Id.* Watkins argues that each of these comparators were treated more favorably by Strauch in her limited duty assignments. Specifically, she contends that Strauch allowed these employees to work full days performing administrative work—including the performance of "make work"—in their limited duty job assignments.

Defendant argues that Watkins' comparators are not similarly situated to Watkins, because they worked in different positions with different job duties, leave policies, pay, and collective bargaining agreements. Defendant contends that Strauch listed the only true comparator here—J.S.—who was a City Carrier. Defendant notes that J.S. received the same treatment in being limited to similar work assignments as Watkins.

The Court will address the comparators in turn.

**i. B.S.**

B.S. was a Supervisor, Customer Service ("SCS"). (Doc. 37-26 at 5.) This is a management-level position under the USPS's Executive and Administrative Schedule ("EAS"). As a SCS, B.S. was not a bargaining unit employee. Her duties and responsibilities included supervising city and/or rural delivery operations, supervising window services, providing training, and monitoring performance. *Id.*

Watkins has not established that she is similarly situated to the position of SCS. *See LaCroix v. Sears, Roebuck, and Co.*, 240 F.3d 688, 694 (8th Cir. 2001) (person in a different

department with a different position was not "similarly situated" in all relevant respects). On its face, "Supervisor, Customer Service" is a different job than "City Carrier," and Watkins has offered no specific facts or evidence to show that B.S. was similarly situated and treated differently. The fact that B.S. was subject to the provisions of EL-505 alone is not sufficient to satisfy this rigorous standard.

**ii. B.B.**

B.B. was a Vehicle Operations and Maintenance Assistant ("VOMA") at all relevant times. VOMAs are responsible for conducting vehicle inspections, performing minor maintenance and repairs, and monitoring contractor performance. (Doc. 37-26 at 5-6.) As such, a VOMA is not the same or similar position as that of a city postal carrier.

Additionally, B.B., unlike Watkins, suffered an ***off the job*** injury, and did not submit a request for a light duty assignment. *Id.* at 6. Off the job injuries are covered by the USPS's ***light*** duty job assignment requirements, and not the ***limited*** duty requirements that governed Watkins' on the job injury. *Id.* at 2. As explained in the Declaration of Daniel Muskopf, current Manager of Labor Relations for the USPS's Kansas-Missouri District, "[t]he term 'light duty' refers to work provided by the Postal Service to employees with restrictions due to a non-compensable injury or illness, commonly referred to as an off-the-job injury." *Id.*

Watkins characterizes B.B.'s injury as an on the job injury based on Strauch's testimony that B.B. confided in her that he believed "years of opening and closing his LLV door" had caused his shoulder injury. (Doc. 37-24 at 233.) Regardless of B.B.'s stated belief of the origin of his injury, it is undisputed that B.B. never filed a claim for a work-related injury. As noted by Strauch, B.B. indicated that his work "could have been part of" the cause of his injury, but "he

said he did not want to file and he did not." *Id.* He was not, therefore, eligible for a limited duty work assignment.

Strauch testified that she could not mandate that B.B. accept a light duty assignment under these circumstances. She explained as follows:

> Q. Okay. So if I understand that correctly, what it's in effect saying is that if an employee is hurt off the job, it's up to them whether or not they submit a request for a voluntary sort of light duty assignment?
>
> A. Correct.
>
> Q. And [B.B.] didn't do that?
>
> A. He did not.

*Id.* at 234. Because B.B. did not submit a request for a light duty assignment, he continued to perform his work duties without limitations after sustaining his injury.

Watkins argues that Strauch treated B.B. more favorably than her in that "Strauch admits she made no effort to monitor whether B.B.'s tasks were being safely performed while he was in a sling despite admittedly hiding behind boxes to watch Plaintiff to ensure she was not violating restrictions while Plaintiff was on her 'limited duty' assignment." (Doc. 48 at 14.) As Defendant points out, Strauch testified that she has "never hidden behind any box at any time at any installation." (Doc. 37-24 at 238.) Strauch also testified that she observed B.B. safely performing his duties while he was injured. *Id.* at 236.

In sum, Watkins has failed to present any evidence supporting that B.B. was similarly situated to her.

**iii. Rural Carriers: T.H., S.E., and J.P.**

The remaining identified comparators—T.H., S.E., and J.P.—were all Rural Carriers

during the relevant time. Defendant argues that they are not similarly situated to Watkins, a City Carrier.

As a City Carrier, Watkins was a member of the National Association of Letter Carriers ("NALC") and subject to their collective bargaining agreement. (Doc. 37-25 at 16.) Rural Carriers, including T.H., S.E., and J.P., were members of the National Rural Letter Carriers' Association ("NRLCA"), and subject to that union's collective bargaining agreement. (Doc. 37-24 at 70; Doc. 37-26 at 4.) Rural Carriers have different hiring standards, job duties, and pay requirements than City Carriers. (Doc. 37-26 at 4.) Defendant also points out that there are no light duty assignments for Rural Carriers. (Doc. 37-26 at 4.)

Strauch testified extensively on the differences regarding how City and Rural Carriers take leave, which are dictated by their collective bargaining agreements and USPS rules. She explained how these differences impacted the limited duty work assignments she was able to give to Rural Carriers compared to the assignments she was able to give Watkins. Strauch explained the leave policies applicable to Rural Carriers as follows:

> A. They go home. They take leave, annual leave, leave without pay, whichever. Then someone else comes in, takes over the route, the RCA, and they take and they get paid. Same thing is if they come in and they're not feeling well and they decide that, you know, I just can't make it. I don't care if you were there for an hour, if you were there for six hours, you do not get paid. You did all that work, you take sick leave—or annual leave, if that's what you have—and then somebody else would come in and do the route.
>
> Q. And how would it work with the NALC collective bargaining agreement?
>
> A. The NALC, if somebody came in and said they were working their route and extra hours, six hours, said, "I was sick, I need to go home," I pay them up until the time they clock out. And if they're a full-time employee, then they would take leave up to eight hours. If they're a CCA, their day would end.

(Doc. 37-24 at 262-63.)

Defendant notes that Strauch's testimony is consistent with ELM leave provisions. As explained in the Declaration of Jason D. Marsh, Attorney for the USPS's Employment Law Office-West, City Carriers are allowed to use as little as one-hundredth of an hour of annual leave, whereas Rural Carriers must take minimum units of one day (8 hours) of annual leave. (Doc. 53-2 at 2; Doc. 53-4 at 4.)

For this reason, Strauch testified that she permitted Rural Carriers S.E. and J.P. to answer phones and perform other administrative work when they were injured and receiving worker's compensation benefits. (Doc. 37-24 at 194.) With regard to T.H., Strauch testified that she allowed him to organize tax receipts. (Doc. 37-24 at 230.) She explained that when she arrived at the Poplar Bluff Office, there were a couple years' worth of tax receipts from fuel purchases. *Id.* Strauch testified that T.H. completed this project, and there was no remaining work like this she could have assigned to Watkins. *Id.*

Strauch testified that she did not consider the administrative duties assigned to S.E. and J.P. as "make work," because Rural Carriers were "a different craft from the NALC." *Id.* Strauch elaborated:

> A. In the NALC, you can take ten minutes of leave, you can take three hours of leave, you can take the whole day of leave. Whatever you want. For a rural carrier, you're not entitled to that. You either get paid the entire day or you get paid nothing.
> So if you come in to work and you go home sick, you take a full day of sick leave. You come in to work, you're driving your personal vehicle and your vehicle breaks down and you're not able to complete the route, you take leave and someone else does the route and you do not get paid for the route.
> So because of that, because there are blocks of hours that you must full—fulfill—fill, however you want to say it, um, that is why after they did the work—the other duties that they were doing, they did other work in the office.

> Q. So you were comfortable with giving them make-work because of—because otherwise, what, they would not get paid for the whole day?
>
> A. I had to provide them with some work equivalent to the full eight hours or their full evaluated time because of how they get paid.

*Id.* at 194-95.

Watkins acknowledges that Rural Carriers' leave is measured in full day increments, but argues that Strauch was willing to "bend EL-505's prohibition on 'make work'" for S.E. and J.P.—Caucasian and heterosexual employees—but strictly construed EL-505's rules for Watkins. (Doc. 48 at 14.)

Strauch's testimony reveals that she did not believe she was "bending rules," by allowing S.E. and J.P. to answer the phones as suggested by Watkins. She insisted that her decisions were based on the "needs of the Postal Office." (Doc. 37-24 at 196.) She again explained that Watkins "has a different contract," and, as such, Strauch was "not required to do a full eight-hour bid for her. She can have reduced hours just like J.S. had reduced hours." *Id.* at 197. Strauch further elaborated:

> A. I made the offer to S.E. , and then the offer was made to J.P. by Josh because they were needed on their routes. Because they were rural carriers, underneath their contract, they're—it's an all-or-nothing for them. So they—
>
> Q. So you decided to make work?
>
> A. No. I decided I needed them to get the mail out, I needed them to do training for future career employees, and that is what I chose to do. If I didn't have that available, then I had to finish off the remaining eight hours because that is part of their contract.
>
> Q. By making work. Correct?
>
> A. By providing them work.

> Q. Yeah. Providing them work that could have been done by the—this—the supervisors or the 204b?
>
> A. Work that the supervisors and the 204bs were also doing.
>
> Q. Okay. It wasn't a redundancy; it wasn't a waste of resources when it was those two, but it was for Ms. Watkins?
>
> A. Ms. Watkins wanted to just answer the phone. I could not provide her additional work. I could not provide her clerk work. I had too much staffing. The only thing that I had available was what I gave her, and she—her eight hours can be broken down into a smaller section by contract, by tax—via payroll. Um, ***so that is the reason why there's a difference between craft, not people***.

*Id.* at 209-10 (emphasis added).

Because it is undisputed that T.H., S.E., and J.P. were Rural Carriers subject to different contracts, different job duties, and different leave policies, they are not similarly situated in all relevant respects to Watkins. To the extent Strauch "bent the rules" regarding make work when assigning work to S.E. and J.P, it is clear from her testimony that she did this based on their status as Rural Carriers and not their race, sexual orientation, or any other discriminatory reason. Thus, Watkins has failed to meet the rigorous standard of showing S.E. and J.P. were similarly situated in all relevant respects but treated differently.

**iv. City Carrier J.S.**

Defendant argues that Strauch identified the only true comparator here: J.S., a male, Caucasian, heterosexual City Carrier. Defendant contends that J.S. was treated the same as Watkins in that he was offered a limited duty job assignment of working only two hours casing his route and an auxiliary route after suffering an on-the-job injury in May 2024.

Watkins does not dispute that J.S. is a heterosexual, Caucasian male; was supervised by Strauch; suffered an on-the-job injury; and was assigned a reduced schedule of limited work.

Instead, she argues that J.S. is "in terms of this litigation, the least similarly situated." (Doc. 48 at 15.) Watkins contends that J.S.'s injury and his limited duty offer occurred after Strauch knew she was the subject of Watkins' discrimination charge. She notes that Strauch admits that she heard rumors Watkins was planning to file an EEO complaint before the complaint was formalized in January 2024. (Doc. 37-24 at 247.) Watkins argues that a reasonable trier of fact could conclude that Strauch's decisions regarding J.S.'s limited duty assignment "after she had been outed by Plaintiff was necessarily informed by the allegations against her." (Doc. 48 at 15.)

It is undisputed that J.S.'s injury occurred after Strauch had received notice of Watkins' EEO complaint in January of 2024. Assuming this distinction is relevant, the fact remains that *none of the comparators identified by Watkins are similarly situated*.

Thus, Watkins has failed to show that Strauch treated similarly-situated employees in a disparate manner.

### 3. Shifting Explanations

Watkins argues that Strauch's shifting explanations of her employment decisions give rise to an inference of discrimination. Watkins cites her October 2023 recorded conversation with Strauch, during which Watkins asked about the refusal to allow her to answer phones as she had done for other employees. Watkins notes that Strauch "did not offer Plaintiff an explanation describing differences in craft, interactions of collective bargaining agreements, or assessments of contemporaneous workloads." (Doc. 48 at 16.) Instead, she responded to Watkins' request to answer phones by stating: "That is make work and I am not required to give you make work." (Doc. 37-7 at 165.) When Watkins complained that "[e]verybody else did it,"

Strauch again stated, "I am not required to give you make work." *Id.* Watkins next objected that her restrictions allowed her to work eight hours but she was only getting three hours, to which Strauch responded that the "three hours would work within your restrictions." *Id.* Watkins argues that Strauch did not explain at that time that she had looked, but could not find, eight hours of work.

The Court finds Watkins' argument unavailing. None of the statements cited by Watkins contradict Strauch's current testimony. Strauch has not wavered in her explanation as to why Watkins could not answer the phones or work a full day: there was not sufficient available work within Watkins' restrictions to provide eight hours of work, and she could not assign Watkins make work. The fact that Strauch did not elaborate on her responses during a conversation that she did not know was being recorded does not support Watkins' argument that Strauch's explanation shifted.

Thus, Wakins has not shown that Defendant shifted its explanation for the employment decision over time sufficient to show pretext.

Again, the Court is not a "super-personnel department" and does not review "the wisdom or fairness" of Defendant's limited duty assignments. *Beasley v. Warren Unilube, Inc.*, 933 F.3d 932, 939 (8th Cir. 2019). It is reasonable for Watkins to feel her reduced schedule was unfair. But she simply has put forth *no evidence* of intentional discrimination. Defendant, on the other hand, has produced evidence of extensive and complex rules that Strauch had to navigate in conjunction with the rapidly changing daily needs of the Poplar Bluff PO when crafting limited duty job assignments. Strauch's cited reasons for assigning Watkins' less than eight hours of limited duty work are reasonably supported by the evidence presented. Watkins' belief that

Strauch's actions were discriminatory is insufficient to avoid summary judgment. Under these circumstances, no rational factfinder could find discrimination.

Accordingly, Watkins has failed to demonstrate a dispute of material fact sufficient to defeat summary judgment on her race and sex discrimination claims. The Court will therefore grant Defendant's Motion for Summary Judgment as to Counts I and II.

### C. Watkins' Retaliation Claim (Count III)

In Count III of the Complaint, Watkins alleges that she had a good faith belief that Defendant was engaging in unlawful discrimination by improperly denying her bidding opportunities for routes and/or schedules in 2016; disciplining her in 2017; denying her limited duty "make work" opportunities in 2023; and improperly monitoring and/or disciplining her in 2023 and 2024. Watkins alleges that Defendant retaliated against her for opposing these unlawful employment practices by denying her "make work" opportunities while she was on limited duty assignments and by subjecting her to improper monitoring and/or discipline.

***Legal Standards***

"Without direct evidence of a retaliatory motive, [the Court] analyzes retaliation claims (whether under Title VII, the ADA, or the ADEA), under the burden-shifting framework of *McDonnell Douglas*...." *Stewart v. Indep. Sch. Dist. No. 196*, 481 F.3d 1034, 1042-43 (8th Cir. 2007). To establish a prima facie case of retaliation, Watkins must establish that: (1) she participated in a protected activity, (2) Defendant took an adverse employment action against her, and (3) a causal relationship existed between the participation in the protected activity and the adverse employment action. *See Trammel v. Simmons First Bank of Searcy*, 345 F.3d 611,

615 (8th Cir. 2003). If the plaintiff meets her prima facie case, the burden shifts to the employer to rebut the presumption of unlawful discrimination by articulating a legitimate, nondiscriminatory reason for its adverse employment action. *Martinez v. W.W. Grainger, Inc.*, 664 F.3d 225, 230 (8th Cir. 2011).

Title VII retaliation claims require the plaintiff to establish but-for causation. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360 (2013). Watkins must show that but-for her protected activity, Strauch would have given her more hours in her limited duty assignments. *See Wright v. St. Vincent Health Sys.*, 730 F.3d 732, 737 (8th Cir. 2013). For Watkins to make her retaliation claim, she "must show that the protected conduct was a 'determinative—not merely a motivating—factor' in [Strauch's] adverse employment decision." *See id.* at 738 (citing *Van Horn v. Best Buy Stores, L.P.*, 526 F.3d 1144, 1148 (8th Cir. 2008)).

***Discussion***

Defendant first argues that Watkins cannot establish causation for her retaliation claim because Strauch had no knowledge of the prior protected conduct. Defendant next argues that Strauch's refusal to assign Watkins "make work" was not retaliatory. Finally, Defendant contends that none of Watkins' supervisors retaliated against her through their supervision.

Watkins responds that summary judgment should be denied on her retaliation claim because a reasonable factfinder could conclude that Strauch "minimized Plaintiff's 'limited-duty' assignments in retaliation for Plaintiff's complaints about discrimination." (Doc. 48 at 17.) Specifically, Watkins argues that Strauch heard rumors Watkins was planning to file an EEO complaint before her initial complaint became formal in January 2024. Watkins contends that Strauch "admits she did not disclose her knowledge of these rumors" when completing her May

3, 2024 sworn EEO affidavit. (Doc. 48 at 18.)

In its Reply, Defendant argues that Watkins has not met her burden of establishing that Strauch gave the October 13, 2023 limited duty assignment with the intent to retaliate based upon a rumored possible EEO complaint, because Watkins failed to show that Strauch heard the rumor before giving the assignment.

As an initial matter, the Court notes that Watkins' Response did not address Defendant's arguments regarding her 2016 and 2017 protected activity, or her claim that Defendant retaliated against her by subjecting her to improper monitoring and/or discipline. Watkins has therefore abandoned these arguments. *See Satcher v. Univ. of Ark. at Pine Bluff Bd. of Trustees*, 558 F.3d 731, 735 (8th Cir. 2009) ("[F]ailure to oppose a basis for summary judgment constitutes waiver of that argument.").

Watkins' retaliation claim has, therefore, been narrowed to the following: Strauch heard rumors that Watkins may be filing an EEO complaint sometime prior to the time she contacted the EEO office on November 27, 2026; and Strauch gave Watkins reduced limited duty assignments in retaliation.

The Court finds that Watkins fails to establish a prima facie case of retaliation. Protected activity under Title VII includes a plaintiff's opposition to practices made unlawful by Title VII. 42 U.S.C. § 2000e-3(a). "An employee must show that the employer had actual or constructive knowledge of the protected activity in order to establish unlawful retaliation." *Hervey v. County of Koochiching*, 527 F.3d 711, 722 (8th Cir. 2008).

Here, Watkins fails to establish that Strauch had knowledge that Watkins was filing an EEO complaint prior to assigning her limited duty work in October 2023. Watkins argues that

Strauch admits that she had heard rumors that Watkins planned to file an EEO complaint before she formalized her complaint in January 2024. She contends that Strauch "did not deny that she may have heard these rumors as early as September 2023—i.e., before she made decisions regarding Plaintiff's last two 'limited duty' requests." (Doc. 48 at 18.) Watkins cites Strauch's deposition testimony in support of her claims.

In her deposition, Strauch confirmed that she had "heard rumblings" that Watkins may be filing a discrimination claim prior to receiving formal notice of the charge of discrimination in January 2024. (Doc. 37-24 at 247.) Strauch testified that she did not disclose that she was aware of Watkins being involved in EEO activity prior to the filing of her complaint because, "A rumor is a rumor." *Id.* at 247-48. She explained, "I had nothing that knew—I knew nothing in writing. I did not get contacted by the EEO office at the district level. It was just rumors, and there are lots of rumors within a post office." *Id.* at 248.

When pressed if she may have heard these rumors prior to October 5, 2023, Strauch testified as follows:

> A. I don't remember when I heard.
>
> Q. Possible, but you don't know one way or another?
>
> A. I really honestly don't know.
>
> Q. Same thing then for October 13, 2023, you may have heard it; you don't remember one way or another?
>
> A. I don't recall. I know it was before the EEO office contacted me, whenever that was.
>
> Q. Okay.
>
> A. And I don't have a date.
>
> Q. Sometime between September 13th, let's say, and January?

> A. I can't even say that, because I don't know what date.
>
> Q. Maybe even before September?
>
> A. I don't know when she started the grumblings and it started coming back to me. I don't know.

*Id.* at 248-49.

The Court finds that Watkins' EEO complaint could not have caused Strauch's reduced limited duty assignments because the assignments occurred *before* the complaint was made. It is undisputed that Watkins had her initial contact with the EEO Office and filed an informal complaint on November 27, 2023. The Eighth Circuit makes clear that "alleged retaliation which precedes protected conduct cannot logically be used to show causation because a prior event cannot be caused by a later event." *Stewart*, 481 F.3d at 1044.

Strauch's testimony establishes only that she heard rumors that Watkins was considering filing an EEO complaint at some time prior to January 2024. Watkins offers no authority for the proposition that overheard rumors of an employee's potential desire to engage in protected activity can demonstrate knowledge of the employee's engaging in protected activity sufficient to establish retaliation. Further, even if the overheard rumors could suffice, Watkins has not shown that Strauch overheard the rumors prior to assigning Watkins limited duty work in October 2023. Under these circumstances, a rational juror could not find a causal link between Watkins' EEO complaint first initiated in November 2023, and Strauch's assignment of limited duty work in October 2023.

Because Watkins cannot show retaliation under the *McDonnell Douglas* framework, her claim of retaliation cannot survive summary judgment.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for Summary Judgment (Doc. 37) is **granted**. A separate Judgment in favor of Defendant will accompany this Memorandum and Order.

Dated this 15th day of September, 2026.

/s/ *Abbie Crites-Leoni*
ABBIE CRITES-LEONI
UNITED STATES MAGISTRATE JUDGE